# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DOUGLAS PAUL WINGERT,  :
            :
  Petitioner      :
            :
 v.          :   3:11-CV-01905
            :
DAVID W. PITKINS, et al.,   :  (Judge Nealon)
            :
  Respondents    :

FILED
SCRANTON

DEC 1 2 2014

PER _____ DEPUTY CLERK

## MEMORANDUM

Petitioner, Douglas Paul Wingert, has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Doc. 1). He challenges a conviction and sentence imposed by the Court of Common Pleas for Franklin County, Pennsylvania. Id. Wingert raises several grounds for relief: (1) the trial court erred in admitting Wingert's confession, (2) the trial court erred in allowing testimony of a prior rape conviction, (3) the trial court erred in excluding the testimony of Wingert's paramour, (4) the evidence was insufficient to sustain a conviction, (5) the jury determination was against the weight of the evidence, (6) the trial court erred in failing to merge certain convictions, (7) the sentences exceed the aggravated range for the convictions, (8) trial counsel was ineffective for failing to investigate a witness, and (9) trial counsel was ineffective for failing to seek the dismissal of two jurors. Id.

In accordance with <u>United States v. Miller</u>, 197 F.3d 644 (3d Cir. 1999), and

<u>Mason v. Meyers</u>, 208 F.3d 414 (3d Cir. 2000), this Court issued formal notice to

Wingert that he could either have the petition ruled on as filed but lose his ability

to file a second or successive petition, or withdraw his petition and file one all-

inclusive § 2254 petition within the one-year statutory period prescribed by the

Antiterrorism Effective Death Penalty Act ("AEDPA"). (Doc. 3). On November

10, 2011, Wingert returned the notice of election, indicating that he wished to

proceed with his petition for writ of habeas corpus as filed. (Doc. 5). On February

24, 2012, Respondents filed a response to the habeas petition. (Doc. 16). Wingert

filed a traverse on March 9, 2012, rendering this matter ripe for disposition. (Doc.

19). For the reasons set forth below, the petition will be denied.

## I.    Statement of Relevant Facts

The following background is taken from numerous attachments to the

Respondents' response, including the trial transcript and subsequent court

decisions in this matter. <u>See</u> (Docs. 17, 18).

### A.    Pre-Trial Hearing

On April 7, 2004, a pre-trial hearing was held on Wingert's motion to

suppress statements made during his arrest on June 11, 2003. (Doc. 17, Att. 1, Ex.

A). Trooper Joseph Davidson, one of the arresting officers, testified that after

bringing Wingert to the State Police Barracks, he began a formal interrogation. <u>Id.</u>

at p. 27.  Initially, Wingert denied any presence at the scene of the crime.  Id. at 38.

Thereafter, Trooper Davidson informed Wingert that he had been identified in a

photo lineup and he matched the description of the assailant.  Id. at 39.  Trooper

Davidson also asserted that Wingert's work records placed him in the general

vicinity of the crime at around the time of the crime.  Id.  He also informed

Wingert that they were in possession of the victim's cell phone and a phonebook

from the crime scene, and that they intended to test both items for fingerprints.  Id.

at 40.  At that point, Wingert admitted to assaulting the victim by grabbing her

breast.  Id. at 27-29.  Thereafter, he refused to continue speaking, and the interview

was concluded.  Id. at 30.

Wingert testified that, prior to arriving at the State Police Barracks, Trooper

Davidson promised that "if I admitted to what I've done, that he would help me

out."  Id. at 72.  Wingert stated he believed Trooper Davidson was promising to

have the attempted rape charge dismissed.  Id.  Wingert further testified that, upon

arriving at the State Police Barracks, Trooper Davidson again promised that if

Wingert pleaded guilty to the charges, he "would go to bat with . . . the D.A. to try

and possibly get the criminal attempted rape dropped."  Id. at 74.  Wingert

reiterated his belief that Trooper Davidson "would go talk to the District Attorney

and get the criminal attempted rape dropped."  Id.  Wingert testified that, after

receiving this promise, and only due to this promise, he admitted his presence at the scene, and admitted to touching the victim's breast. Id. at 75.

On cross-examination, Wingert admitted that Trooper Davidson only "implied that he would help me out if I continued." Id. at 87. Wingert never received a specific promise that the attempted rape charge would be withdrawn. Id. at 97.

On April 28, 2004, Judge Van Horn issued a decision denying the motion to suppress statements. (Doc. 17, Ex. 1, Att. F). Judge Van Horn found that no coercion was present, other than promises by Trooper Davidson to help Wingert in some way if he confessed. Id. at 15. She noted that the interrogation lasted less than ninety (90) minutes, and there was no evidence that Wingert was psychologically fragile until after his confession was given. Id. at 16. Neither of the Troopers present at the interrogation could recall making any promises of "going to bat" for Wingert. Id. Judge Van Horn further noted that Wingert was unable to "keep straight what happened first," having once stated that he confessed before any promises of leniency, and later stating that he confessed only after promises of leniency were made. Id. at 17.

Consequently, Judge Van Horn found that Wingert's assertion was not credible. Id. at 16-17. She further found that, even if his allegations were true, "a promise to bring a suspect's cooperation to the attention of the authorities (when

4

accompanied by no other coercive tactics) does not render his confession involuntary." Id. at 17.

## B. Trial

At trial, the victim, Esther Horst, was called to testify. (Doc. 17, Att. 1, Ex. B, p. 14). Ms. Horst, who was working as a teacher, stayed late at school on the afternoon of May 22, 2003 to finish work. Id. at 16. Ms. Horst noticed a large white box truck driving slowly down the street past the school, but concluded that the driver must be lost, and went back to work. Id. at 17. After a short while, the truck had driven into the school driveway, and past her classroom. Id. At approximately 5:15 p.m., Ms. Horst left school for the day but, because it was the defense than Mr. Effland would have been. Since fair-minded jurists could, at

After taking two (2) loads to her car, Ms. Horst was returning to her classroom when she noticed the same white truck traveling slowly down the road toward the school. Id. Ms. Horst exited the building and inquired whether the driver of the truck needed any help. Id. at 19. The man, whom Ms. Horst identified as Wingert, stated that he was lost and needed help finding Keystone Ford on Antrim Way. Id.

Ms. Horst informed Wingert that she did not know the directions to this location, and suggested that he ask one of the neighbors nearby. Id. at 20. He was not receptive to this idea, and Ms. Horst went inside the school to retrieve a

phonebook so that Wingert could call Keystone Ford. Id. at 21. He then claimed that his cell phone battery was dead, at which point Ms. Horst led him into the school to use a school phone. Id. at 21-22. Ms. Horst left Wingert alone with the phone while she brought more items to her car. Id. at 23.

Ms. Horst testified that, upon returning to the building, Wingert clamped his hand over her mouth, held a knife to her throat, and informed her that if she made a sound, he would kill her. Id. Wingert pushed Ms. Horst into a classroom and turned her to face the wall. Id. at 24. He then removed one hand from Ms. Horst's mouth, began feeling her breast with that hand, and ordered her to unzip her jacket. Id. at 25. Wingert pulled up Ms. Horst's dress and slip, and began feeling her vaginal area over her underwear. Id. at 26. Afterwards, Wingert again began feeling her breast, and tried to remove her jacket. Id. At some point, Ms. Horst was able to free herself and run out of the classroom towards the building's front door. Id. at 27.

Approximately halfway to the front door, Wingert caught Ms. Horst and threw her onto the ground. Id. at 28. He pinned her to the ground, straddled her waist, held her shoulder down with one hand, and held a knife to her throat with the other hand. Id. at 28-29. Wingert stood up and ordered Ms. Horst to turn over onto her stomach; Ms. Horst then stood up and ran outside. Id. at 29. He grabbed

at her clothing, but Ms. Horst managed to evade his grasp. Id. at 30. Wingert initially pursued her, but stopped, got into his truck, and drove away. Id.

After describing the events that transpired on May 22, 2003, Ms. Horst testified that, approximately one and one-half (1 ½) weeks later, she identified Wingert in a photo lineup as the man who attacked her. Id. at 35. Ms. Horst again confirmed that the defendant present in the courtroom that day, Wingert, was the man who attacked her. Id.

After Ms. Horst testified, Sandy Neihart was called to testify about an incident that occurred in 1985. Id. at 57. Ms. Neihart testified that late one evening in May 1985, Wingert offered to walk her home after a party. Id. at 59. After the two walked into a wooded area, Wingert grabbed Ms. Neihart and held a knife to her throat. Id. at 60. She screamed, and two women approached. Id. At that point, Ms. Neihart ran away. Id. Wingert caught her, grabbed her by the neck, and forced her to take her clothes off at knifepoint. Id. He then raped Ms. Neihart twice and forced her to perform oral sex on him. Id. at 60-61. Ms. Neihart eventually managed to kick Wingert and run away. Id. at 61.

Michelle Masters was then called to testify. Id. at 68. Mrs. Masters testified that on May 22, 2003, she and her husband were driving home when Ms. Horst flagged down their car and informed them that someone had tried to rape her. Id.

at 69-70. Mrs. Masters and her husband drove Ms. Horst to a nearby location so that she could contact her parents. Id. at 71.

Finally, Trooper Davidson testified about the interrogation that occurred after Wingert's arrest. Id. at 121. Trooper Davidson testified that Wingert initially denied having any knowledge of the attack on Ms. Horst. Id. at 122. After a short while, Wingert admitted that he had gotten into an argument with Ms. Horst, and admitted to grabbing her breast. Id. at 123.

## C.    Sentencing

Wingert was convicted by the jury on five (5) counts: criminal attempted rape, indecent assault, terroristic threats, unlawful restraint, and simple assault. (Doc. 17, Att. 1, Ex. D, p. 10). The minimum sentence for criminal attempted rape was ten (10) years. Id. Terroristic threats and unlawful restraint carried a standard range of eighteen (18) to twenty-four (24) months, and simple assault carried a standard range of twelve (12) to twenty-four (24) months. Id. at 10-11.

Judge Van Horn found that none of the crimes merged; she concluded that the incident included "many events that took place over a period of time." Id. at 11. Judge Van Horn believed that one incident occurred in the classroom, and a separate incident occurred in the hallway; thus, the crimes could not merge. Id.

Judge Van Horn outlined Wingert's past criminal history, citing this history as "the most critical information" available. Id. at 12. She noted that Wingert had

been convicted of theft by unlawful taking in 1982 and burglary in 1983. Id. In 1985, he was sentenced to seven (7) to fifteen (15) years for rape, involuntary deviate sexual intercourse, and corruption of minors. Id. While incarcerated, Wingert was convicted of indecent assault on a female prison staff member, and was sentenced to another six (6) to twenty-four (24) months. Id. Wingert was released from prison in 2002, at which time he committed two (2) additional crimes that were sexual in nature. Id. at 12-13.

Judge Van Horn concluded that Wingert had "gained no benefit from any of the education that was provided" during seventeen (17) years of incarceration, and her primary concern was for the "protection of society." Id. at 13. Consequently, Judge Van Horn declared that she was "not going to let [Wingert] out one day earlier than possible" because of his "propensity to reoffend." Id.

Based upon that consideration, and the "overwhelming evidence that [Wingert was] a sexually-violent predator[,]" Judge Van Horn sentenced him to ten (10) to twenty (20) years for criminal attempted rape, one (1) to two (2) years for indecent assault, and one (1) to two (2) years for simple assault. Id. at 13-14. Additionally, Wingert was sentenced to two and a half (2 ½) to five (5) years for terroristic threats, and two and a half (2 ½) to five (5) years for unlawful restraint. Id. Judge Van Horn explained that, though these sentences were outside the standard range, they were warranted given Wingert's "history and propensity to

9

reoffend and the need to protect society[.]" Id. at 14. All sentences were to be served consecutively, for a total of seventeen (17) to thirty-four (34) years. Id.

### D.   Post-Sentencing Proceedings

Wingert appealed all issues, save for the ineffective assistance of counsel issues, to the Pennsylvania Superior Court. (Doc. 18, Att. 1, Ex. J). On September 27, 2006, the Superior Court issued a decision affirming the lower court's decisions in all respects. Id. On December 30, 2008, the Pennsylvania Supreme Court denied Wingert's Petition for Allowance of Appeal. (Doc. 18, Att. 1, Ex. L).

On March 23, 2010, a Post Conviction Relief Act ("PCRA") hearing was held. (Doc. 17, Att. 1, Ex. E). In his amended PCRA petition, Wingert alleged ineffective assistance of counsel based on his trial counsel's, Justin McShane ("Counsel"), failure to interview Ms. Masters prior to trial and failure to strike two (2) jurors, Mr. Effland and Ms. Nolan, who may have been biased. Id. at 3.

At the PCRA hearing, Counsel was called to testify. Id. at 8. First, Counsel discussed Ms. Masters' statement that the victim blurted out that someone had attempted to rape her. Id. at 11. Counsel testified that, although it was not recorded in the transcript, "there was an objection that I lodged with respect to not being informed of the thrust of the witness's testimony." Id. Counsel stated that he had not been provided with any notes on Ms. Masters' anticipated testimony, and "I very much recall being shocked by the fact that she had anything to say

because I believe it was Trooper Hockenberry's report certainly didn't have the level of detail that Mrs. Masters now was stating." Id. at 12.

Counsel stated that, after Ms. Masters testified, his strategy was "to get this witness off the stand before she does any more damage with any sort of new information[,]" and therefore, he chose to impeach her through Trooper Hockenberry's police report, rather than through a direct impeachment. Id. at 13-14. While he was surprised by the statement made by Ms. Masters, Counsel testified that, in his professional opinion, he "would be shocked if a single juror sat back and found that to be a compelling statement that led to guilt." Id. at 14. Counsel followed up by stating that:

> There was a tremendous amount of overwhelmingly bad evidence also a very sympathetic victim in Ms. Horst. To this day I very much remember her testimony that was there. So in my personal and profession opinion, the corroborative statement of Mrs. Masters that Mrs. Horst had said that she had been raped or someone had tried to rape her was as if a grain-in-the-sand type of situation.

Id. Counsel admitted that he had to "hastily prepare a fairly specific cross examination" because he was "shocked that Mrs. Masters was testifying period." Id. at 15.

Counsel then testified that, during voir dire it was revealed that juror number sixty-nine (69), Mr. Effland, had a son who was a lieutenant at Franklin County Prison. Id. at 16-17. Counsel chose not to strike Mr. Effland from the jury because there were "a lot of other people that needed to be struck that I had on a

much higher priority than someone whose son was a lieutenant at the Franklin County prison." Id. at 17.

Counsel maintained that Wingert never informed him that the lieutenant stated "good luck" in reference to his father being on the jury. Id. at 17-18. Counsel stated without equivocation that "I [do] not believe that occurred, if that would have occurred, I would have noted it [and] I would have asked for a mistrial." Id. at 18.  Counsel was confident Wingert never mentioned this conversation because:

> As I mentioned to the District Attorney, it's not an automatic preclude. But if it had been brought up to me, especially in the context of it as Mr. Wingert claimed, boy, there's no way that person would stay on that jury, and if the person had made it on the jury and it comes subsequent to that, they made it on the veneer. I definitely, definitely would have alerted the Court.
>
> As an officer of the court, it would be my duty to do so because that's indirect contact with the juror. I would also ask for a mistrial to get rid of – try and get rid of what I surmised to be a not proaccused jury impaneled.

Id. at 26.

Counsel stated that Wingert had never, at any time prior to or during the trial, informed him that juror number one hundred fifty-seven (157), Ms. Nolan, had seen Wingert at the Franklin County prison. Id. at 18-19.  Counsel's notes did not reflect any such statement from Wingert. Id. at 19.  Counsel iterated his understanding of the importance that such contact would have in a trial, as shown

12

by his actions to have a different juror removed after she witnessed Wingert being transported to the courthouse in handcuffs the morning of the trial.[1] Id. at 30-31.

Wingert testified that he did not recall Counsel ever objecting to the testimony of Ms. Masters. Id. at 34-35. Wingert also testified that Lieutenant Effland, a son of one of the jurors impaneled for Wingert's trial, approached him on the morning of May 12, 2004 and stated "I understand my dad is part of your jury . . . Good luck." Id. at 36. Wingert did not interpret the "good luck" statement as "a good thing." Id. Wingert testified that, as soon as he saw Counsel that day, he told Counsel about the statement. Id. According to Wingert, Counsel "acted like he didn't care" about the revelations. Id. at 27.

Wingert testified that he also saw another juror, Ms. Nolan, at the prison on May 10, 2004, the day she was impaneled on the jury, as she visited her cousin. Id. at 37. She passed within five (5) or six (6) feet of Wingert and made eye contact with him. Id. Wingert stated that he had informed Counsel of this event at the same time he informed Counsel of the issues with Mr. Effland. Id. at 38.

---

[1] On the second day of trial, Counsel stated "I would like to preliminarily start with something my client drew to my attention . . . He indicated to me that Juror No. 1 . . . saw him this morning handcuffed and being transported into the building. I think that's obviously an issue." (Doc. 17, Att. 1, Ex. C, p. 3). After confirming that the juror had in fact witnessed Wingert being escorted into the building, Counsel asked that the juror be excused from the jury, at which time Judge Van Horn removed her from the jury. Id. at 8-9.

On June 30, 2010, Wingert's PCRA petition was denied on the merits. (Doc. 18, Att. 1, Ex. O). First, the PCRA Court found that, while an attorney generally has a duty to undertake a reasonable investigation prior to trial, it was reasonable for Counsel to conclude that an interview of Ms. Masters would have been "of no value to his client's case." Id. at 9. The PCRA Court further concluded that the investigation undertaken by Counsel "was reasonable based on the materials provided and the information available at the time." Id. Specifically, Counsel reasonably expected the police report to recount any such statement, Wingert never asked Counsel to interview Ms. Masters, and it could be assumed that Ms. Horst would have told Ms. Masters why her assistance was needed. Id. Additionally, the PCRA Court found that, even if an omission occurred, any omission would have been harmless given the "overwhelming" evidence presented at trial. Id. at 10.

Second, the PCRA Court found that Counsel was not ineffective for failing to attempt to remove the two (2) jurors. Id. at 17-19. The PCRA Court noted that all jurors had sworn an oath to render a fair and impartial verdict. Id. at 17. The PCRA Court also found that Wingert's claims were not "at all credible" given Counsel's reputation "as a zealous advocate for his client, meticulous in his creation of a record for appellate review, and dogged in his pursuit of any issue which could accrue to the benefit of his client." Id. at 18. Finally, the PCRA

Court found that Wingert's claims were further called into question by Counsel's removal of a different juror due to the fact that she had witnessed Wingert being escorted into the courthouse in handcuffs. Id.

On March 15, 2011, the Pennsylvania Superior Court affirmed the PCRA Court's decision. (Doc. 18, Att. 1, Ex. R). On September 14, 2011, the Pennsylvania Supreme Court denied Wingert's Petition for Allowance of Appeal. (Doc. 18, Att. 1, Ex. T).

## II. Discussion

In their response, Respondents argue that Counts one (1) through seven (7) of Wingert's petition should be dismissed as untimely. (Doc. 16). Moreover, Respondents argue that the petition should be denied in its entirety on its merits. Id. Wingert argues that his petition is timely and should be granted. (Doc. 19).

### A. Wingert's Petition is Not Time Barred

Respondents concede that claims eight (8) and nine (9) were filed within the one year statute of limitations. (Doc. 16). However, Respondents contend that Wingert "may be ineligible for habeas review" on claims one (1) through seven (7) "because the one-year statute of limitation of these claims has expired." Id. Respondents contend that Wingert did not raise claims one (1) through seven (7) in his PCRA petition, and therefore the statute of limitations was not tolled during that period of time. Id.

To bring a petition for writ of habeas corpus, a petitioner must comply with a strict one year statute of limitations. 28 U.S.C. § 2244(d). In relevant part, the statute of limitations begins to run "the date on which the judgment became final by the conclusion of direct review[.]" 28 U.S.C. § 2244(d)(1)(A). However, the statute of limitations is tolled during the time that "a properly filed application for State post conviction or other collateral review with respect to the pertinent judgment or claim is pending[.]" 28 U.S.C. § 2244(d)(2).

Here, Wingert's direct appeal, encompassing claims one (1) through seven (7), concluded on December 20, 2008 when the Pennsylvania Supreme Court denied an Allowance of Appeal. (Doc. 18, Att. 1, Ex. L). Consequently, the one year statute of limitations began to run on that date. 28 U.S.C. § 2244(d)(1)(A). Wingert filed a PCRA petition on February 2, 2009, forty-four (44) days after the statute of limitations began to run. (Doc. 18, Att. 1, Ex. M). At that point, the statute of limitations was tolled, with three hundred twenty-one (321) days remaining.

Thereafter, Wingert's PCRA petition was denied, and the Pennsylvania Supreme Court denied an Allowance of Appeal on September 14, 2011. (Doc. 18, Att. 1, Ex. O, T). The statute of limitations again began to run, and continued running until this petition was filed on October 18, 2011, thirty-four (34) days later. (Doc. 2). Therefore, at the time Wingert filed his habeas petition, two

16

hundred eighty-seven (287) days remained on the statute of limitations, and the petition is not time barred.

Contrary to Respondents' position, the statute of limitations does not apply to each claim individually, but rather applies to the judgment as a whole. See Sweger v. Chesney, 294 F.3d 506, 521 (3d Cir. 2002) (holding that a properly filed PCRA petition tolls the statute of limitations for all claims arising out of the state court judgment, not just those brought in the PCRA petition). The statute of limitations was tolled for all nine (9) of Wingert's claims, not only those claims raised in the PCRA petition. Id. Therefore, the entirety of Wingert's habeas petition has been brought within the statute of limitations.

**B.    Wingert's Claims for Relief**

Under the AEDPA, "federal courts are to review a state court's determinations on the merits only to ascertain whether the state court reached a decision that was 'contrary to' or involved an 'unreasonable application' of clearly established Supreme Court law, or if a decision was based on an 'unreasonable determination' of the facts in light of the evidence presented." Fahy v. Horn, 516 F.3d 169, 189 n.20 (3d Cir. 2008) (citing, 28 U.S.C. § 2254(d)). Any factual determinations "made by a State court shall be presumed to be correct[,]" and the petitioner bears the "burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

17

A state court decision is contrary to clearly established Supreme Court law "if the state court reaches a conclusion opposite to the Supreme Court's own conclusion on a question of law or decides the case differently where the Supreme Court was confronted by a set of materially indistinguishable facts." Harris v. Ricci, 607 F.3d 92, 96 (3d Cir. 2010) (quoting McMullen v. Tennis, 562 F.3d 231, 236 (3d Cir. 2009)). "Similarly, a state court ruling is considered an 'unreasonable application' if the state court unreasonably applies the correct legal rule to the particular facts, unreasonably extends a legal principle to a new context, or unreasonably refuses to extend the principle to a new context where it should apply." Id. Under this standard, the state court decision must have been "'objectively unreasonable,' not merely wrong; 'clear error' will not suffice." White v. Woodall, 134 S.Ct. 1697, 1702 (2014) (quoting Lockyer v. Andrade, 538 U.S. 63, 75–76 (2003)).

In applying AEDPA's standards, a district court reviews "the state courts' last reasoned opinion" on the matter. Bond v. Beard, 539 F.3d 256, 289 (3d Cir. 2008). "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

1. *State Court Determination that Wingert's Admission was Not Coerced*

Wingert first asserts that the trial court erred in admitting his confession to the Pennsylvania State Police, a confession that he claims was coerced. (Doc. 1). Specifically, Wingert believes that the "false" promise of Trooper Davidson that he would "go to bat" for Wingert created a coercive environment that rendered the confession involuntary. Id.

The Fifth Amendment of the United States Constitution protects an individual from self-incrimination. U.S. Const. amend. V.  The prosecution may not use any statements made by a defendant unless the individual is first informed of his or her right to remain silent, that any statement made may be used as evidence against him or her, and that he or she has a right to an attorney. See Miranda v. Arizona, 384 U.S. 436, 444 (1966).  An individual may waive these rights so long as the waiver is voluntary, knowing, and intelligent. Id. Absent such a waiver, any confession taken during a custodial interrogation violates the individual's right against self-incrimination. Id.

"[A] statement is involuntarily when the suspect's 'will was overborne in such a way as to render his [or her] confession the product of coercion." Lam v. Kelchner, 304 F.3d 256, 264 (3d Cir. 2002) (quoting Arizona v. Fulminante, 499 U.S. 279, 288 (1991)).  In reaching this determination, the court must consider "the totality of all the surrounding circumstances – both the characteristics of the

19

accused and the details of the interrogation." Dickerson v. United States, 530 U.S.

428, 434 (2000) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)).

The "surrounding circumstances" include police coercion, the length of

interrogation, location and continuity of the interrogation, as well as the

defendant's maturity, education, physical condition, and mental health. Lam, 304

F.3d at 264 (quoting Colorado v. Connelly, 479 U.S. 157, 167 (1986); Withrow v.

Williams, 507 U.S. 680, 693 (1993)).  While the question of whether a statement

was voluntary is a legal question requiring independent determination by the

district court, underlying factual determination, such as determinations of whether

the police used intimidating tactics, are entitled to AEDPA deference. See Miller

v. Fenton, 474 U.S. 104, 112 (1985).

The trial court determined, and Wingert does not dispute, that he was given

his Miranda warnings prior to giving his confession. (Doc. 18, Att. 1, Ex. F, p.

14).  In determining whether Wingert's statement was given voluntarily, the trial

court considered the totality of the circumstances surrounding the confession. Id.

Judge Van Horn noted that the interrogation lasted less than ninety (90) minutes in

all and "took place in a room in which victims and suspects alike talk with the

police." Id. at 16.  Furthermore, Wingert was not psychologically fragile during

his confession, although he did get emotional and "breakdown" afterward. Id.

Ultimately, Judge Van Horn concluded that Wingert's allegations were not credible. Id. at 17. In that vein, Judge Van Horn observed that neither Trooper Davidson nor Trooper Hockenberry recalled making any promises to Wingert. Id. Furthermore, the trial court found it significant that Wingert could not "keep [his story] straight[,]" once claiming that he confessed prior to the purported promise, but later claiming that he confessed after the purported promise. Id. Consequently, Judge Van Horn found that Wingert's statement was voluntary. Id. The Superior Court affirmed, determining that the trial court's factual findings were supported by the record. (Doc. 18, Att.1, Ex. J, p. 5).

The facts do not demonstrate that the state court decision was based on an "unreasonable determination" of the facts in light of the evidence. Fahy, 516 F.3d at 189 n. 20. The only evidence Wingert offers in support of his claim is his own testimony. (Doc. 19). This testimony is undermined by his conflicting statements and the sworn testimony of two (2) Pennsylvania State Troopers. In light of this, Wingert's testimony alone does not constitute clear and convincing evidence sufficient to rebut the trial court's factual determinations. Therefore, those findings are accepted as true. 28 U.S.C. § 2254(e)(1). No promise of leniency was made to Wingert during the interrogation, and thus his confession was not coerced by the interrogating State Troopers. (Doc. 18, Att. 1, Ex. F, p. 17).

Furthermore, Judge Van Horn reached this determination by considering the totality of the evidence surrounding the interrogation, id. at 14-16, consistent with federal requirements. Connelly, 479 U.S. at 167; Williams, 507 U.S. at 693. Therefore, the state court determination was not contrary to clearly established Supreme Court law. Id.

### 2. *Testimony Relating to Prior Convictions*

Wingert alleges that the trial court erred in allowing testimony from his prior rape victim. (Doc. 1). "Admission of 'other crimes' evidence provides a ground for federal habeas relief only if 'the evidence's probative value is so conspicuously outweighed by its inflammatory content, so as to violate a defendant's constitutional right to a fair trial.'" Bronshtein v. Horn, 404 F.3d 700, 730 (3d Cir. 2005) (quoting Lesko v. Owens, 881 F.2d 44, 52 (3d Cir. 1989)).

Judge Van Horn admitted testimony of Wingert's prior conviction under Pennsylvania Rule of Evidence 404(b)(2), which provides that prior convictions "may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." (Doc. 18, Att. 1, Ex. F, p. 20-22). Judge Van Horn noted several similarities between the prior rape in 1985, and the attempted rape that Wingert was standing trial for: (1) both victims were "young, white, innocent females[,]" (2) both victims were "found alone in a public place and approached in a friendly manner[,]" (3) in both

22

instances, Wingert "made polite conversation with them and asked for their assistance with something[,]" (4) in both instances, Wingert suddenly "put his hand over the victims' mouth and put a knife to their throats[,]" (5) Wingert threatened to kill both victims if they did not comply with his demands, (6) both victims were "instructed, at knifepoint, to remove articles of clothing[,]" (7) both victims were forced to move to a more private location, (8) a knife was constantly held to the throat of both victims, (9) Wingert gave chase to both victims after they attempted to run, and (10) Wingert "fled the scene after each victim successfully ran away from him." Id. at 21. As a result of these similarities, Judge Van Horn concluded that "the allegations constitute a common plan" and allowed evidence of Wingert's prior conviction. Id. at 22.

Judge Van Horn further concluded that the probative value of admitting the prior conviction was "far greater than the prejudice" that would result. Id. She reasoned that, although the previous conviction had occurred eighteen (18) years prior, Wingert had been in prison for seventeen (17) of those years. Id. Therefore, there had only truly been a one (1) year gap between the crimes, and the 1985 rape "was not too remote in time to be probative." Id. Judge Van Horn further determined that the prior conviction was "highly probative of [Wingert's] intent and plan to commit rape" at the time of the attack. Id. at 23. The facts showed a remarkable similarity between the two (2) ttacks, with the only genuine difference

resting upon the fact that Ms. Horst was able to free herself from Wingert's grasp prior to any rape occurring. Id. at 23-24. Judge Van Horn concluded that any prejudice resulting from the prior conviction would be minimized by the ability of Counsel to cross-examine the witness and by the jury's ability to weigh the witness' credibility. Id. at 24.

Testimony of Wingert's prior conviction was undoubtedly inflammatory and prejudicial to his defense. However, the testimony was also highly probative, particularly concerning his intent to commit rape. The trial court accurately noted that the prior rape of Ms. Neihart and the attempted rape of Ms. Horst were factually similar and therefore highly relevant. Given the probative nature of the testimony, this Court cannot conclude that the testimony regarding Wingert's prior rape conviction was "conspicuously outweighed by its inflammatory content, so as to violate a defendant's constitutional right to a fair trial." Bronshtein, 404 F.3d at 730.

### 3. *Trial Court's Refusal to Allow Testimony from Wingert's Paramour*

Wingert contends that the trial court's decision to disallow the testimony of his paramour violated the confrontation clause as well as his due process rights. (Doc. 19). Respondents argue that this decision was reasonable. (Doc. 16).

The United States Supreme Court has demonstrated a "traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial

courts." <u>Crane v. Kentucky</u>, 476 U.S. 683, 690 (1986). However, "the right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations," and includes the right "to call witnesses in one's own behalf." <u>Chambers v. Mississippi</u>, 410 U.S. 284, 294 (1973). To establish a due process violation, the defendant must establish that: (1) he or she was "deprived of the opportunity to present evidence in his [or her] favor;" (2) "the excluded testimony would have been material and favorable to his [or her] defense;" and (3) "the deprivation was arbitrary or disproportionate to any legitimate evidentiary or procedural purpose." <u>Gov't of Virgin Islands v. Mills</u>, 956 F.2d 443, 446 (3d Cir. 1992) (citing <u>Rock v. Arkansas</u>, 483 U.S. 44, 56 (1987)).

Wingert has satisfied the first prong of this test, as the record clearly establishes that he was deprived of the opportunity to present his paramour's testimony at trial. (Doc. 18, Att. 1, Ex. H, p. 6-10). He has failed, however, to demonstrate that the excluded testimony was material.

Judge Van Horn allowed Wingert's paramour to testify, outside the presence of the jury, regarding his sexual proclivities. (Doc. 18, Att. 1, Ex. A, p. 138-40). The paramour related that she had been in a sexual relationship with Wingert for some time prior to the attack on Ms. Horst. <u>Id.</u> at 139. She further testified that they could not have sexual intercourse unless she was on top and he "stimulate[d]

himself as far as the nipples." Id. at 139-40.  Wingert argued that, because these conditions were not met during the attack on Ms. Horst, he could not have formulated the specific intent to commit the crime of rape.  Id. at 140-42.

Judge Van Horn found that this testimony was excludable as irrelevant for four (4) reasons.  First, the evidence was not being offered "from a medical standpoint to prove incapability."  Id. at 144.  Second, there was "no link between" Wingert's sexual history with his paramour and the attack on Ms. Horst, since one situation involved consent, while the other involved "violence, force and nonconsent." (Doc. 18, Att. 1, Ex. H, p. 9-10).  Third, the paramour "could not conclusively say that [Wingert's] sexual problems would arise" in the context of a forced rape.  Id.  Fourth, Wingert's "inability to sustain an erection in normal sexual relations ha[d] no influence on the determination of whether or not he intended to attempt to rape the victim."  Id.

Judge Van Horn concluded that even if the paramour's testimony could conclusively demonstrate that Wingert was physically incapable of committing the act of rape, this alone was not conclusive of his ability to formulate intent to commit rape.  Id. at 7-8.  In support of this conclusion, the court referenced Com. v. Reid, 432 Pa. 319 (1968), wherein the defendant argued that his attorney erred by not submitting evidence indicating that he was incapable of committing rape.

The Pennsylvania Supreme Court answered this argument by stating that "rape has frequently been attempted by individuals physically incapable of it[.]" Id. at 323.

Given the differences between the consensual sexual acts that the paramour would testify to and the non-consensual sexual acts that would have been forced upon Ms. Horst, Judge Van Horn did not err in her conclusion that the paramour's testimony would not be relevant to the case. Furthermore, given the Pennsylvania's Supreme Court's statement in Reid, 432 Pa. at 323, Judge Van Horn did not err in concluding that Wingert's purported physical inability to commit the act of rape was irrelevant to his intent to rape the victim. (Doc. 18, Att. 1, Ex. H, p. 9-10). Consequently, the testimony offered by Wingert's paramour was not material, and the trial court did not violate his due process rights by excluding that testimony. Mills, 956 F.2d at 446.

Wingert further contends that the trial court violated the Confrontation Clause by preventing his paramour from testifying. (Doc. 19). The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. Const. amend. VI. "[T]he main and essential purpose of confrontation is to secure for the opponent the opportunity of crossexamination." Delaware v. Van Arsdall, 475 U.S. 673, 678 (1986) (quoting Davis v. Alaska, 415 U.S. 308, 316 (1974)).

27

This Court is unable to discern any violation of the Confrontation Clause here. This is not a situation where the prosecution called a witness and Wingert was denied an opportunity to fully cross-examine that witness. Nor did a witness invoked his or her right against self-incrimination, thereby limiting cross-examination. The testimony of Wingert's paramour was not offered to impeach a prosecution witness, thereby invoking the Confrontation Clause. There is no conceivable scenario in which the trial court's refusal to allow the testimony of Wingert's paramour violated the Confrontation Clause.

### 4. *Sufficiency of the Evidence*

Wingert asserts that the evidence relied upon to convict him was insufficient as a matter of law. (Doc. 1). Specifically, he contends that there was insufficient evidence to show his intent to commit rape and, therefore, insufficient evidence to sustain the guilty verdict for attempted rape. Id. Respondents reply that sufficiency of the evidence "is not an issue available for habeas review" but even if it were, the evidence relied upon was sufficient. (Doc. 16).

The United States Supreme Court has held that "a federal habeas court may review a claim that the evidence adduced at a state trial was not sufficient to convict a criminal defendant beyond a reasonable doubt." Herrera v. Collins, 506 U.S. 390, 401 (1993) (citing Jackson v. Virginia, 443 U.S. 307 (1979)). However, "the relevant question is whether, after viewing the evidence in the light most

28

favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319 (emphasis in original). This standard "does not permit a court to make its own subjective determination of guilt or innocence." Id. at 320. Furthermore, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" Coleman v. Johnson, 132 S.Ct. 2060, 2062 (2012) (quoting Cavazos v. Smith, 132 S.Ct. 2, 3 (2011)).

Here, the evidence was sufficient to support the verdict. Pennsylvania law provides that an individual "commits an attempt when, with intent to commit a specific crime, he [or she] does any act which constitutes a substantial step toward the commission of that crime." 18 Pa.C.S. § 901(a). Rape involves sexual intercourse by use of forcible compulsion or the "threat of forcible compulsion that would prevent resistance by a person of reasonable resolution." 18 Pa.C.S. § 3121(a)(1), (2).

There was no direct evidence demonstrating Wingert's intent to commit rape since he never directly stated that he intended to rape Ms. Horst. Consequently, the jury was required to infer intent to commit rape. In such a situation, a jury is

allowed to "draw reasonable inferences from basic facts to ultimate facts." Jackson, 443 U.S. at 319.

The evidence demonstrated that Wingert committed sexual acts upon Ms. Horst, including fondling her breasts, lifting up her dress, and fondling her vaginal area over her underwear. (Doc. 17, Att. 1, Ex. B, p. 26). Wingert then attempted to remove Ms. Horst's jacket. Id. After Ms. Horst attempted to flee, Wingert chased her down, threw her to the ground, and straddled her before ordering her to turn over onto her stomach. Id. at 28-29. The jury also heard testimony from an individual who was previously raped by Wingert. Id. at 57. That victim testified that Wingert, under similar factual circumstances and using techniques remarkably similar to those used against Ms. Horst, had raped her multiple times. Id. at 59-61.

Viewing these facts in the light most favorable to the prosecution, it cannot be said that "no rational trier of fact could have agreed with the jury." Johnson, 132 S.Ct. at 2062. The jury could reasonably have inferred that Wingert possessed a clear intent to rape Ms. Horst in the schoolhouse, and her actions alone prevented this rape from occurring. A reasonable juror could have concluded that when Wingert ordered Ms. Horst to turn onto her stomach, he possessed the intent to rape, since he could no longer fondle her breasts or vaginal area as he had done when committing indecent assault.

The Superior Court found that the "testimony of the two victims provided the jury with considerable evidence that [Wingert] intended to commit rape." (Doc. 18, Att. 1, Ex. J, p. 9). This conclusion was not objectively unreasonable, and consequently, the evidence was sufficient to sustain Wingert's conviction.

5. *Weight of the Evidence*

Wingert also argues that the jury verdict was against the weight of the evidence. (Doc. 1). Respondents assert that this claim is not a proper basis for federal habeas relief. (Doc. 16). A challenge to the weight of the evidence requires an evaluation of the credibility of the evidence presented at trial. See Tibbs v. Florida, 457 U.S. 31, 37–38 (1982). On a petition for habeas relief, federal courts are bound by the factual findings of the state courts. See Marshall v. Lonberger, 459 U.S. 422, 434–35 (1983) (holding that federal courts may not "redetermine [the] credibility of witnesses whose demeanor has been observed by the state trial court, but not by them").

Consequently, numerous courts within this circuit have held that challenges to the weight of the evidence produced at trial are not cognizable in habeas proceedings. See, e.g., Lockhart v. Patrick, 2014 WL 4231233, *22 (M.D. Pa. 2014); Dove v. York Cnty., PA, 2013 WL 6055226, *18 (M.D. Pa. 2013); Velazquez v. Grace, 2006 WL 89214, *11 (M.D. Pa. 2006); Ramos v. Collins, 2013 WL 5429285, *1 (E.D. Pa. 2013) aff'd, 2013 WL 5429305 (E.D. Pa. 2013);

Anger v. Wenerowicz, 2012 WL 5208554, *2 (W.D. Pa. 2012) report and recommendation adopted, 2012 WL 5208654 (W.D. Pa. 2012).  As such, Wingert has not stated a cognizable claim, and this Court lacks jurisdiction to review this claim.

### 6. *Merger*

Wingert argues that the trial court violated his rights under the Double Jeopardy Clause when it failed to merge certain convictions. (Doc. 1). Specifically, he argues that the conviction for indecent assault should have merged with the conviction for attempted rape, and the conviction for simple assault should have merged with attempted rape. Id.

The Double Jeopardy Clause provides that no "person [shall] be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. This clause protects against multiple punishments for the same offense. North Carolina v. Pearce, 395 U.S. 711, 717 (1969).  In determining whether two convictions that resulted from the same act or transaction merge, a court must examine both offenses and determine whether each offense requires proof of an element that the other does not. Blockburger v. United States, 284 U.S. 299, 304 (1932). "If each requires proof of a fact that the other does not, the Blockburger test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes[.]" Iannelli v. United States, 420 U.S. 770, 785 n.17 (1975).

The relevant Pennsylvania case law employs a substantially similar test. As Judge Van Horn noted, under Pennsylvania law, "[t]wo offenses merge when it is determined that the elements of one are identical to or capable of being wholly contained within the other, and where the factual predicate of the lesser included offense is part of the factual predicate of the greater offense." (Doc. 18, Att. 1, Ex. G, p. 14) (citing Com. v. Martin, 611 A.2d 731, 734 (Pa. Super. 1992); Com. v. Weakland, 521 Pa. 353, 364 (1989)).

a.    Attempted Rape Did Not Merge with Indecent Assault

Judge Van Horn determined that the attempted rape charge should not merge with the indecent assault charge. (Doc. 18, Att. 1, Ex. G, p. 16). Judge Van Horn acknowledged that the elements of indecent assault are "completely subsumed within the elements of criminal attempt to commit rape[.]" Id. at 15. However, she ultimately concluded that in this instance, the convictions did not merge because Wingert committed the crimes during two separate, distinct acts. Id. at 16.

Judge Van Horn examined Wingert's actions that day, and concluded that he committed indecent assault when he touched Ms. Horst's breast and vaginal area in the classroom. Id. This crime was completed when Ms. Horst freed herself from Wingert's grasp and ran from the classroom. Id. He then committed attempted rape when he pursued Ms. Horst into the hallway, threw her to the ground, straddled her, and ordered her to turn onto her stomach. Id. Judge Van Horn noted

that, upon grabbing Ms. Horst in the hallway, he did not resume indecent contact with her, and indecent assault would be improbable if Ms. Horst turned onto her stomach as ordered. Id. Citing to Com. v. Belsar, 544 Pa. 346 (1996), Judge Van Horn determined that, because Wingert had completed indecent assault, and because that criminal act "was broken off," the subsequent act of attempted rape constituted "a separate and distinct crime." Id.

This conclusion was not "contrary to" and did not involve an "unreasonable application" of clearly established Supreme Court law. 28 U.S.C. § 2254(d). Furthermore, while another fact finder may have concluded that the act of indecent assault and the act of attempted rape were not separate and distinct acts, the trial court's factual determination is owed significant deference. 28 U.S.C. § 2254(e)(1). Wingert has not produced clear and convincing evidence to rebut the presumption of correctness owed to the trial court's finding, and this Court must assume the correctness of that conclusion.

     b.    <u>Attempted Rape Did Not Merge with Simple Assault</u>

The trial court also determined that the attempted rape charge should not merge with the simple assault charge. (Doc. 18, Att. 1, Ex. G, p. 17). In so concluding, Judge Van Horn undertook an analysis of the two crimes. Id. Simple assault occurs when a person "attempts to cause or intentionally, knowingly or recklessly causes bodily injury to another [or] attempts by physical menace to put

another in fear of imminent serious bodily injury[.]" 18 Pa.C.S. § 2701(a). In contrast, an individual commits attempted rape when, with the intent to commit rape, he or she commits any act that would constitute a substantial step towards engaging in sexual intercourse by forcible compulsion. 18 Pa.C.S. § 901(a); 18 Pa.C.S. § 3121(a)(1).

Judge Van Horn determined that the act of simple assault required bodily injury or the fear of bodily injury. (Doc. 18, Att. 1, Ex. G, p. 17). In contrast, the act of rape did not require any bodily injury.[2] Id. Furthermore, the act of rape required sexual intercourse "which by definition requires some penetration, however slight[,]" while simple assault had no such sexual element. Id. The trial court cited to Com. v. Anderson, 538 Pa. 574, 582 (1994), and concluded that,

_____

[2] This conclusion is in accordance with at least one decision of the Pennsylvania Superior Court. In Com. v. Irvin, the Superior Court stated:

> the degree of force involved in rape . . . is defined, not in terms of the physical injury to the victim, but in terms of the effect it has on the victim's volition. [This] crime[] [is] committed when the actor accomplishes the crime by forcible compulsion or by threat of forcible compulsion that would prevent resistance by a person of reasonable resolution. The force necessary to support [a] conviction[] for rape . . . need only be such as to establish lack of consent and to induce a woman to submit without additional resistance. As one court has noted, [t]he degree of force required to constitute rape is relative depending upon the particular circumstances. Actual application of force is not required.

260 Pa. Super. 122, 126 (1978) (internal citations and quotations omitted).

because the crimes required "proof of an element which the other" did not, the crimes did not merge. (Doc. 18, Att. 1, Ex. G, p. 17).

This finding was not contrary to, nor did it involve an unreasonable application of, clearly established Supreme Court law. As the trial court correctly noted, simple assault requires bodily injury or the fear of bodily injury, while rape requires force or the threat of force. 18 Pa.C.S. § 2701(a); 18 Pa.C.S. § 3121(a)(1). Rape requires sexual intercourse, while simple assault does not contain any sexual requirement. Id. Furthermore, the acts that established one crime were not necessary to establish the other. Simple assault was established when Wingert grabbed Ms. Horst and threw her to the ground. The substantial step in furtherance of attempted rape, and the threat of force needed, occurred when Wingert held a knife to Ms. Horst's throat and threatened her life. As both offenses required proof of an element that the other did not, and did not require proof of the same facts, the trial court correctly concluded that the offenses do not merge.

   7. *Sentencing Beyond the Aggravated Range*

In his seventh count, Wingert asserts that he is entitled to habeas relief because the trial court imposed a sentence beyond the aggravated range for two of his convictions. (Doc. 1). He does not point to any relevant constitutional violation in his petition or in his traverse. (Docs. 1, 19). Rather, Wingert's claim is based in state law, inasmuch as he argues that the "record is insufficient to

support . . . the imposition of a sentence beyond the aggravated range[.]" (Doc. 19). Here, the trial court's decision to impose a sentence beyond the aggravated range does not implicate any federal Constitutional concerns, and habeas relief is not appropriate.

Matters of sentencing are generally issues of state concern, and therefore usually do not fall within the purview of a federal habeas petition. See Chapman v. United States, 500 U.S. 453, 465 (1991) (stating that after an individual is convicted of a crime, "the court may impose[] whatever punishment is authorized by statute for his offense, so long as that penalty is not cruel and unusual, and . . . is not based on an arbitrary distinction") (internal citations omitted). See also Johnson v. State of Ariz., 462 F.2d 1352, 1353 (9th Cir. 1972) (stating that "ordinarily matters of rules of sentencing adopted by the State courts do not raise constitutional issues which may be reached by habeas proceedings").

A sentence may violate the United States Constitute in certain circumstances. The United States Supreme Court had held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi v. New Jersey, 530 U.S. 466, 490 (2000). The Supreme Court followed Apprendi by noting, however, where sentencing guidelines are "merely advisory . . . rather than required . . . their use [does] not

implicate the Sixth Amendment. We have never doubted the authority of a judge to exercise broad discretion in imposing a sentence within a statutory range." United States v. Booker, 543 U.S. 220, 233 (2005).

Significantly, Pennsylvania's statutory sentencing scheme is both "advisory" and "guided." Com. v. Yuhasz, 592 Pa. 120, 131 (2007). This means that Pennsylvania "require[s] a judge to consider the guidelines by the Pennsylvania Commission of Sentencing in choosing a minimum sentence" but the judge may provide a sentence that exceeds the statutory guideline so long as he or she provides a contemporaneous written explanation. Id. at 131-32 (quoting 42 Pa.C.S. §§ 9756, 9721). Thus, the Pennsylvania Supreme Court has affirmed that "[i]t is well established that the Sentencing Guidelines are purely advisory in nature" and trial courts "may sentence defendants outside the Guidelines." Id. at 132-33. "The only line that a sentence may not cross is the statutory maximum sentence." Id. at 133.

Because Pennsylvania's sentencing scheme is advisory in nature, the trial court's decision to exceed the sentencing guidelines does not implicate federal Constitutional concerns. Booker, 543 U.S. at 233. Consequently, Wingert is only entitled to habeas relief if the sentences exceeded the statutory maximum sentence.

Wingert first challenges his sentence on his conviction for Terroristic Threats, a misdemeanor in the first degree. 18 Pa.C.S. § 2706(d). A misdemeanor

in the first degree carries a maximum sentence of five (5) years. 18 Pa.C.S. §

106(b)(6). Judge Van Horn sentenced Wingert to a maximum sentence of five (5)

years in prison on the charge of terroristic threats. (Doc. 17, Att. 1, Ex. D, p. 13-

14). Consequently, the sentence imposed did not exceed the statutory maximum.

Wingert next challenges the sentence for his conviction for Unlawful

Restraint, also a misdemeanor in the first degree. 18 Pa.C.S. § 2902(a). The

maximum sentence for this conviction was likewise five (5) years. 18 Pa.C.S. §

106(b)(6). The trial court again sentenced Wingert to a maximum sentence of five

(5) years, which is within the statutory maximum. As neither sentence implicated

federal Constitutional concerns, this claim must be dismissed.

### 8. _Ineffective Assistance of Counsel_

Wingert challenges the effectiveness of his trial counsel in two respects. To

establish ineffective assistance of counsel, a petitioner must satisfy a two-pronged

test. Strickland v. Washington, 466 U.S. 668, 687 (1984). First, the petitioner

must show that his or her counsel's "performance was deficient" by demonstrating

that "counsel made errors so serious that counsel was not functioning as the

'counsel' guaranteed the defendant by the Sixth Amendment." Id. There is a

strong presumption that counsel rendered adequate assistance to the petitioner, and

judicial scrutiny "of counsel's performance must be highly deferential." Id. at 689.

Second, the petitioner must demonstrate that "the deficient performance prejudiced the defense." Id. at 687. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. The petitioner must establish that "there is a reasonable possibility that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

When an individual asserts ineffective assistance of counsel in a Section 2254 habeas petition, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable[, not whether] defense counsel's performance fell below Strickland's standard." Harrington v. Richter, 131 S.Ct. 770, 785 (2011). "A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself." Id. Thus, a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. at 786 (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

a. Counsel's Failure to Interview or Investigate Ms. Masters

Wingert asserts that Counsel was ineffective for failing to interview and/or investigate Ms. Masters prior to trial. (Doc. 1). Specifically, he contends that the

failure to interview Ms. Masters resulted in the admission of a damaging statement made by the victim. Id.

The PCRA Court considered this issue and concluded that Counsel was not ineffective for failing to interview Ms. Masters. (Doc. 18, Att. 1, Ex. O, p. 7-13). The PCRA Court acknowledged that Counsel had a duty to undertake a reasonable investigation prior to trial, id. at 8, but concluded that Counsel did not "abdicate[] his duty to investigate and prepare for" Wingert's trial. Id. at 9.

The PCRA Court found that Counsel's limited investigation was "reasonable based on the materials provided and the information available at the time." Id. In that vein, Counsel testified that he expected that the police reports provided to him would detail any inculpatory statement made by Ms. Horst to Ms. Masters. Id. The PCRA Court also noted that because "Ms. Masters found the victim after the attack, it could be assumed that the witness would have been told something about why her assistance was needed." Id. Therefore, Counsel could reasonably have concluded that there was no need to interview Ms. Masters, as her likely testimony could be anticipated. Id.

Next, the PCRA Court determined that no prejudice resulted from Counsel's failure to interview Ms. Masters. Id. Counsel had testified at the PCRA hearing that Ms. Horst was such a compelling witness that he believed any attempt to deny the attack would "invite a brawl in the jury room over which member was chosen

41

to hand down the guilty verdict." Id. Therefore, Counsel chose instead to attempt to downplay the severity of the attack. Id. Consequently, the PCRA Court concluded that because Ms. Masters did not witness the attack, interviewing her would have had no effect on Counsel's strategy. Id. at 9-10. Similarly, the Court reasoned that Ms. Horst's statement to Ms. Masters constituted an excited utterance, and was admissible during trial. Id. at 10. Therefore, "[a]n interview would not have aided in the exclusion of evidence[,]" and would not have impacted the trial in any way. Id.

Additionally, the PCRA Court noted that "the evidence against [Wingert] was overwhelming." Id. Ms. Horst testified to the attack "with a forthright and distinctively truthful manner." Id. The vehicle that Wingert used during the attack "was licensed out of state, and was distinctive" thereby leading to the eventual identification of Wingert as the assailant. Id. at 11. The PCRA Court found that Ms. Masters' testimony was relatively inconsequential, and quoted Counsel's description of the testimony as "a 'grain of sand in the desert.'" Id.

The PCRA Court's application of the Strickland standard was not unreasonable. The evidence establishes that, even if Counsel's performance was deficient, such deficiency did not prejudice Wingert. Wingert asserts that he was prejudiced by Ms. Masters' testimony because it was "highly damaging." (Doc. 19). However, even if Counsel had known of the statement before trial, he could

not have excluded the testimony. (Doc. 18, Att. 1, Ex. O, p. 10). Furthermore, interviewing Ms. Masters would not have produced any useful information or dictated a different trial strategy, as is generally required to show prejudice. See Lewis v. Mazurikieqicz, 915 F.2d 106, 115 (3d Cir. 1990).

Wingert has not demonstrated that Counsel would have proceeded any differently knowing the content of Ms. Masters' testimony, and has not shown that a different cross-examination strategy would have altered the outcome of the trial. As the PCRA Court noted, Counsel's trial strategy was not to impeach Ms. Masters' testimony directly, but to impeach her testimony "by its omission from the investigator's report" during cross-examination of Troopers Hockenberry and Davidson. (Doc. 18, Att. 1, Ex. O, p. 11). Counsel chose this strategy because Ms. Masters was "very sympathetic, and unknown to both victim and [Wingert], therefore having no motive to fabricate." Id. Consequently, Counsel likely would not have altered his strategy had he known the content of Ms. Masters' testimony prior to trial, and Wingert did not suffer any prejudice due to this omission.

b.  Counsel's Failure to Strike or Remove Jurors

Wingert alleges that Counsel was ineffective for failing to strike or remove juror sixty-nine (69) and juror one hundred fifty-seven (157) from the jury. (Doc. 1). Juror 69, Mr. Effland, was the father of a guard at the prison where Wingert

43

was held while awaiting trial. (Doc. 17, Att. 1, Ex. E, p. 16-17). Juror 157, Ms. Nolan, allegedly saw Wingert at prison prior to the start of trial. Id. at 18-19.

The record supports the PCRA Court's determination that Counsel was not ineffective for failing to strike or remove Mr. Effland or Ms. Nolan from the jury. First, while Wingert alleges that Ms. Nolan saw him in prison, the PCRA Court concluded that his allegation was "a blatant falsehood" and found that his testimony was not credible. (Doc. 18, Att. 1, Ex. O, p. 19). The PCRA Court based this conclusion on Counsel's credibility, his reputation as a zealous advocate for his clients, and the fact that Counsel had successfully removed a different juror from the jury on the basis that she had witnessed, for mere seconds, Wingert being escorted into the courthouse in handcuffs. Id. at 18.

Wingert has not offered any evidence, other than his own testimony, to rebut the PCRA Court's factual determination. Wingert's disputed testimony alone does not constitute clear and convincing evidence, and therefore the PCRA Court's conclusion is dispositive of this issue. 28 U.S.C. § 2254(e)(1). As a result, even if Wingert were entitled to de novo review rather than the more deferential standard applicable in a habeas review of a Strickland claim, this Court would not find that Counsel's performance was deficient. Consequently, the habeas petition will be denied on this issue.

Regarding Counsel's failure to strike or remove Mr. Effland from the jury, Counsel likewise was not ineffective. As an initial matter, the PCRA Court found that Wingert's claims, that Mr. Effland's son had stated "good luck" and that Wingert had informed Counsel of this statement, were not credible. (Doc. 18, Att. 1, Ex. O, p. 18-19). As noted previously, Wingert has not rebutted the presumption of correctness that accompanies such a factual conclusion. Thus, the evidence establishes that Counsel was not ineffective for failing to remove Mr. Effland from the jury. Therefore, this Court need only consider whether Counsel was ineffective for failing to strike Mr. Effland during the jury selection process.

The Superior Court reviewed Wingert's contentions and determined that Counsel had a legitimate strategic reason for declining to strike Mr. Effland from the jury. (Doc. 18, Att. 1, Ex. R, p. 9). Counsel explained that "the sheer number of people that unfortunately had family members or friends who were affected by sexually violent acts" forced him to prioritize which jurors he would to strike. (Doc. 17, Att. 1, Ex. E, p. 17). Counsel stated that he chose not to strike Mr. Effland from the jury because there were "a lot of other people that needed to be struck that I had on a much higher priority than someone whose son was a lieutenant at the Franklin County prison." Id.

The Superior Court's decision in this respect is not an unreasonable applicable of the Strickland standard, as Counsel offered a legitimate strategic

reason for declining to strike Mr. Effland from the jury.  Because fair-minded

jurists could, at the very least, disagree on whether the Superior Court's decision

was correct, federal habeas relief on this issue is precluded.  Richter, 131 S.Ct. at

786 (2011).

> ### C.    Certificate of Appealability

Under the AEDPA, a court may not issue a certificate of appealability

"unless 'the applicant has made a substantial showing of the denial of a

constitutional right.'"  Slack v. McDaniel, 529 U.S. 473, 483 (2000) (quoting 28

U.S.C. 2253(c)).  The "petitioner must demonstrate that reasonable jurists would

find the district court's assessment of the constitutional claims debatable or

wrong."  Id. at 484.  When a district court "denies a habeas petition on procedural

grounds without reaching the prisoner's underlying constitutional claim," a

certificate of appealability should be issued if "jurists of reason" would find that:

(1) it is debatable whether the petition states a valid claim for the denial of a

constitutional right, and (2) it is debatable whether the district court was correct in

its procedural ruling.  Id.  Wingert has not satisfied this standard and, as a result, a

certificate of appealability will not be issued.

## IV.   Conclusion

A review of the record reveals that counts five (5) and seven (7) do not state

claims cognizable under 28 U.S.C. § 2254, and these claims are therefore

dismissed.  Wingert has failed to sustain his burden of proof on the remaining

counts, and the remainder of the petition for writ of habeas corpus will be denied.

An appropriate order will follow.

Dated:  December 11, 2014                    United States District Judge